*385 OPINION.
Trammell :
There is no controversy with respect to the facts material in this proceeding, which were stipulated by the parties and are set out in our findings of fact, above. The sole issue for decision is whether certain income, received by the petitioner during the calendar year 1919 from the manufacture of 6-inch gun mounts for the Navy Department is taxable under section 301 (c) of the Revenue Act of 1918, as income derived from a Government contract or contracts made between April 6, 1917, and November 11, 1918.
The Revenue Act of 1918 provides as follows:
Sec. 301. (e) For the taxable year 1919 and each taxable year thereafter there shall be levied, collected, and paid upon the net income of every corporation which derives in such year a net income of more than $10,000 from any Government contract or contracts made between April 6, 1917, and November 11, 1918, both dates inclusive, a tax equal to the sum of the following:
(1) Such a portion of a tax computed at the rates specified in subdivision (a) as the part of the net income attributable to such Government contract or contracts bears to the entire net income. In computing such tax the excess-profits credit and the war-profits credit applicable to the taxable year shall be used; * * *
The petitioner admits that in 1919 it derived a net income of more than $10,000 from a Government contract made between April 6,1917, and November 11, 1918, other than the contracts here in question, and the income involved herein is, therefore, taxable under section 301 (c) of the Revenue Act of 1918, supra, if derived from a Government contract made between the dates stated in the statute.
The respondent has determined that said income was so derived, and has computed the deficiency on that basis. The petitioner contends that the action of the respondent in this respect was erroneous for the following reasons: (1) Because the original contract dated September 17, 1918, was not “ made ” within the meaning of the taxing statute between the dates specified therein; (2) because, even if said original contract was made between the dates stated the income in controversy is not attributable to said contract, but was derived from a contract made subsequent to November 11, 1918; and (3) for the reason that section 301 (c) of the Revenue Act of 1918 is unconstitutional.
The stipulated facts disclose that, under the circumstances set out in our findings of fact, above, the petitioner, on September 12, *386 1918, submitted to the Navy Department a written proposal to manufacture certain gun mounts and extra slides at prices and for delivery on dates specified. On September 18, 1918, the Secretary of the Navy advised the petitioner that its proposal was accepted, and on October 11, 1918, the Navy Department forwarded contract and bond forms to the petitioner for execution. These contract forms, dated September 17, 1918, provided for the manufacture and delivery by the petitioner of 100 six-inch gun mounts, 50 additional slides for 6-inch gun mounts and spare parts to be furnished in accordance with list to be furnished by the Bureau of Ordnance at prices to be agreed upon. This document is referred to for convenience as the original contract of September 17, 1918. On October 23, 1918, the three copies of the contract, and the bond, were signed by the petitioner, and on October 28, 1918, the bond was executed by a surety company. On October 31, 1918, the bond was formally approved by the Navy Department, and on the same date the three copies of the contract were signed on behalf of the United States. On January 24, 1919, a triplicate original copy of this contract was delivered by the Navy Department to the petitioner, together with a copy of another agreement, designated for convenience as the supplemental contract.
As a result of negotiations between the petitioner and the Navy Department, entered into subsequent to the Armistice, looking to the cancellation or modification of the original contract, forms of a supplemental agreement, in triplicate, dated December 28, 1918, were delivered by the Navy Department to a representative of the petitioner for execution by it. The so-called supplemental contract was executed by the petitioner on January 2, 1919, and was signed by the Secretary of the Navy on January 16, 1919. A copy of the supplemental contract was thereafter delivered to the petitioner by the Navy Department on January 24, 1919, coincident with the delivery of a copy of the original contract.
The issue here is whether the income derived from the manufacture and sale of the gun mounts above mentioned is attributable to a Government contract made between April 6, 1917, and November 11, 1918. Two separate written documents, the so-called original contract and the so-called supplemental contract, are involved. The first problem, then, is to determine whether these documents constitute two separate and distinct contracts, or whether the so-called supplemental contract is merely a modification of, or a supplement to, the so-called.original contract, so that the two instruments together form in effect one contract. If the facts are such that in law the supplemental contract amounted to a new and separate agreement, which abrogated and superseded the original contract, and if the income in question is attributable to the so-called supplemental contract of *387 December 28, 1918, it will in tliat event be unnecessary to consider the petitioner’s first and third assignments of error.
Was the supplemental agreement a new contract? To determine this question we must look to the provisions of the two documents, examine into the circumstances surrounding their execution, and consider the effects flowing therefrom.
Under the original contract, the petitioner agreed to manufacture and deliver to the Navy Department 100 six-inch gun mounts at $23,000 each, 50 additional slides for 6-inch gun mounts at $6,500 each, and spare parts at prices to be agreed upon. The so-called sup•plemental contract provided only for the manufacture and delivery by the petitioner of 100 six-inch gun mounts at the price of $19,850 each. Time was of the essence of the original contract, but was not an essential consideration of the supplemental contract, under which, as a matter of fact, only 13 gun mounts were manufactured and delivered during the year 1919.
The negotiations leading up to the original agreement were conducted during the period of active hostilities, and the prices were agreed upon under war conditions. After the Armistice, the Navy Department found that the 50 additional slides and other spare parts were not needed, but that the 100 six-inch gun mounts were required for installation on ships then under construction. However, it was believed that if the Department declined to go on with the original contract as contemplated, the gun mounts could be purchased later at a lower price. The price stipulated for the gun mounts in the supplemental agreement was based upon market conditions obtaining in December, 1918, after the signing of the Armistice. Thus, it appears that the agreement evidenced by the so-called supplemental contract was materially different from that embodied in the so-called original contract, and was made under materially different circumstances and conditions.
This so-called supplemental contract was, we think, a new agreement, which cancelled and took the place of the original contract, and which by its express terms defined and fixed the rights and obligations of both parties. “An agreement when changed by the mutual consent of the parties, becomes a new agreement, which takes the place of the old, and consists of the new terms and as much of the old agreement as the parties have agreed shall remain unchanged.” 13 C. J. 595. “A contract once made can not be modified except by a new meeting of minds, and when such mind-meeting occurs a new contract springs into existence.” United Transp. & Lighterage Co. v. N. Y. & Baltimore Transp. Line, 185 Fed. 386.
In Mason v. United States, 17 Wall. 67, the facts were similar to those in this proceeding. Mason accepted an order from the War Department to manufacture 100,000 muskets on certain terms speci *388 fied. Later, a commission was appointed to adjust all contracts, orders and claims on the Department in respect to arms. Pursuant to a recommendation of the commission, the order to Mason was reduced to 30,000 muskets, upon condition that he should execute a bond for performance of the contract. The bond was executed, and the 30,000 muskets were manufactured and delivered by Mason in accordance with the new or modified agreement. In considering the status or effect of the agreements, the court, in its opinion, said:
Much discussion of the case is certainly unnecessary, as it is as clear as any proposition of fact well can be, that the claimant voluntarily accepted the modification of the contract as suggested by the commissioners, and that he executed a new contract in its place, which he must have understood was intended to define the obligations of both parties.
Since the so-called supplemental contract constituted, in our opinion, a new agreement executed after November 11, 1918, we must conclude that it does not come within the purview of section 301 (c) of the 1918 Act. It was intended b}r the provisions of that section to subject to the 80 per cent war-profits tax only the net income of corporations amounting to more than $10,000 derived in 1919 and subsequent j^ears from Government supply contracts, made during the war period. It is not difficult to comprehend the reason for, and the equity of, such a provision. The situation is clearly disclosed by an examination of the legislative history of section 301 (c). This section was first introduced into the 1918 revenue bill in the Conference Committee. In explaining the provision to the House, the Chairman of the Ways and Means Committee stated:
Though the 80 per cent war profits tax is eliminated for the next fiscal year— since there are no war profits for 1919-20 — the conferees put in a provision extending the 80 per cent war profits tax for the calendar year 1919 to catch the profits that are derived in 1919 from war contracts made in 1918 and 1917, so that the profiteers will not get off with 80 per cent eliminated after January 1, 1919. They will receive some income during 1919 from war contracts made between the beginning of the war and the signing of the Armistice, November 11. The conferees, Senate and House, were unanimous in the opinion that this should be done. The SO per cent tax will, under this provision, apply to such income. (57 Cong. Rec., p. 3005.)
In explaining this section to the Senate, the Chairman of the Committee on Finance stated:
Mr. Simmons: The Secretary of the Treasury, in his recommendation asking that the war-profits tax be abolished after 1918, suggested that there ought to be provision by which the 80 per cent rate would be continued for profits realized after 1918 from Government contracts made during the war; and the purpose which the conference committee had in view was to see to it that a Government contract heretofore made, and based upon the prices that, had heretofore obtained, should pay the same tax upon .its war profits when those war profits were made in 1919 as it is required under the law to pay when those profits were made in 1918. (57 Cong. Rec., p. 3133.) (Italics supplied.)
*389 The petitioner’s income, here in controversy, does not represent war profits. The gun mounts were actually manufactured and delivered pursuant to the provisions of the contract of December 28, 1918, and the payments therefor were made by the Navy Department in accordance with its terms. The amount of the income derived by the petitioner in 1919 is measured by the price of the gun mounts specified in said contract.
For the foregoing reasons, the facts here lead us to the conclusion that the income in controversy is not attributable to a Government contract within the meaning of section 301 (c).
The conclusion reached by us in this case is not inconsistent with our decision in A. B. Kirschbaum Co., 5 B. T. A. 65, where we held that income received in 1919 by a taxpayer under an agreement entered into in that year for the cancellation of war supply contracts made between April 6, 1917, and November 11, 1918, is income attributable to a Government contract or contracts within section 301 (c). See also R. Hoe & Co., 7 B. T. A. 1277.
In the Kirschbaum case we held that the original contract alone was the cause of the taxpayer’s receipt of the income. If there had been no original contract there would have been no compensation for its cancellation. Here, manifestly, we have a materially different situation. As pointed out above, the original contract did not produce the income received by the petitioner. Nor can the income received under the supplemental contract be said to constitute compensation for cancellation of the former contract. The so-called supplemental contract recited that “The Department has determined and the contractor has agreed to the just basis of compensation for the modification of said contract as desired by the Department; ” and further provided that “ Just settlement to be mutually agreed upon, shall be made on account of the work already done on the 50 additional 6-inch slides which are not now required to be furnished.”
Obviously, the compensation mentioned in the supplemental contract as having theretofore been agreed upon on account of the modification of the original contract, as well as the compensation provided to be thereafter mutually agreed upon on account of the work already done on the 50 additional slides, is an extraneous matter not material in this proceeding. The facts in the record before us do not, in our opinion, justify the conclusion that the income received under the supplemental contract of December 28, 1918,- constituted compensation for cancellation or modification of the original contract of September 17, 1918.
The income here in controversy, not being attributable to a Government contract made between April 6, 1917, and November 11, 1918, is not taxable under section 301 (c) of the Revenue Act of 1918, *390 and the respondent erred in so holding. The deficiency should be redetermined accordingly.
Reviewed by the Board.

Judgment will he entered on 15 days' notice, under Rule 50.

Mokris and Arundell did not participate.